Filed 11/18/20  In re C.S. CA5

## NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

## IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

## FIFTH APPELLATE DISTRICT

| | |
|---|---|
| In re C.S. et al., Persons Coming Under the Juvenile Court Law. | |
| TULARE COUNTY HEALTH AND HUMAN SERVICES AGENCY, Plaintiff and Respondent, v. DAVID S. et al., Defendants and Appellants. | F080862 (Super. Ct. No. JJV070490A, JJV070490B, JJV070490C) **OPINION** |

## THE COURT*

APPEAL from an order of the Superior Court of Tulare County.  Hugo J. Loza, Judge.

Carolyn S. Hurley, under appointment by the Court of Appeal, for Defendant and Appellant David S.

Jessica M. Ronco, under appointment by the Court of Appeal, for Defendant and Appellant Brittany S.

---

*        Before Levy, Acting P.J., Poochigian, J. and Franson, J.

Deanne H. Peterson, County Counsel, John A. Rozum and Amy-Marie Costa, Deputy County Counsel, for Plaintiff and Respondent.

-ooOoo-

Brittany S. (mother) and Davis S., Jr. (father), each appeal from an order after a combined Welfare and Institutions Code section 366.26[1] hearing terminating their parental rights to their three children. Both parents contend the juvenile court erred when it failed to apply the beneficial parent child relationship exception to termination of parental rights. Father, with mother joining, also contends the juvenile court erred in finding that the Indian Child Welfare Act (ICWA; 25 U.S.C. § 1901 et seq.) did not apply due to inadequate inquiry and notice. We affirm.

## FACTUAL AND PROCEDURAL BACKGROUND

Mother has four children, C.S.1, C.S.2, C.S.3, and S.S. C.S.1, mother's oldest child, is under guardianship with his paternal grandmother and not a subject of this appeal. Father is the presumed father of the three younger children and the father of two other children by different mothers, both previously removed from his care by the juvenile court.

On March of 2017, the Tulare County Health and Human Services Agency (agency) received a referral that mother tested positive for methamphetamines at the time of C.S.3's birth. Mother received no prenatal care and admitted using methamphetamine, but only on one occasion in January of 2017, when she was arrested for being under the influence. She admitted sporadic marijuana use during pregnancy. At the time of C.S.3's birth, mother and father had a loud verbal argument in the hospital room with then 16-month-old C.S.2 present. Father stormed out of the hospital, dragging C.S.2 by the arm.

---

[1]     All further statutory references are to the Welfare and Institutions Code unless otherwise stated.

2.

Mother later admitted marijuana and methamphetamine use since her teenage years but denied being addicted. She had an "extensive" criminal history, all related to her drug use. She reported to have depression and anxiety.

Mother reported an "off and on again" relationship with father, stating the relationship was rife with verbal, emotional and physical abuse. She described father as a "mean" drunk and methamphetamine user. Despite these issues, mother allowed father to visit with C.S.2, as she wanted C.S.2 to have a father in her life.

*Detention*

On March 22, 2017, the agency filed a section 300 petition alleging C.S.2 and C.S.3 were at risk of harm due to mother's substance abuse, domestic violence and untreated mental health issues and father's substance abuse and domestic violence issues, as well as prior sibling neglect.

The agency was unable to locate father, reported to be homeless, prior to the detention hearing. Mother appeared at the March 23, 2017, detention hearing and the children were detained in foster care. The juvenile court ordered supervised visits for mother. Mother completed an ICWA-020 form indicating she had no Native American ancestry and verified the same in court.

A jurisdiction/disposition hearing was set for April 25, 2017.

*Jurisdiction/Disposition*

The Court Appointed Special Advocate (CASA) report filed for the jurisdiction/disposition hearing indicated C.S.2 scored in the normal range for all developmental skills, but exhibited numerous behavioral issues, including tantrums, throwing toys and biting.

The agency's report recommended mother be granted six months of reunification services. It also recommended that, even if father was able to elevate his status to presumed father, he nonetheless be denied services pursuant to section 361.5, subdivision (b)(10) and (13). Father had previously been denied reunification services for one of his

other children pursuant to section 361.5, subdivision (b)(13) due to his history of drug offenses, being sentenced twice in criminal court to recovery court, and resisting drug treatment programs.[2]  It was reported that mother was still married to another man, and father was therefore not allowed to sign C.S.2 and C.S.3's birth certificates, although he met the other criteria for being a presumed father.

While in the hospital, mother told the social worker that she did not know if she was going to keep C.S.3 because of father's abusive behavior.  However, she became angry when she learned both C.S.2 and C.S.3 were being detained.

Mother reported she was previously ordered into a drug treatment program by Drug Court in a criminal matter but failed the program and served her sentence.  It was while she was in Drug Court that she met father and began their relationship.  According to mother, father's abusive behavior was more severe during her pregnancies, including one time when he kneed her in the stomach during her pregnancy with C.S.2.  Mother also acknowledged using marijuana and methamphetamine off and on during her pregnancy with C.S.2 as well.

Father reported that his "real" problems with methamphetamine began after his first marriage ended.  He threatened to kill himself, was 5150, and began heavy drug use. Father denied any domestic violence in his relationship with mother and planned to marry her.

When asked about Native American ancestry, father told the social worker his paternal grandparents used to tell him they were Cherokee but were not enrolled with a Cherokee tribe.  Father completed an ICWA-020 form on April 10, 2017 indicating he may have Indian ancestry and identified Cherokee as the tribe.  On that same date, the

---

**2**     Section 361.5, subdivision (b)(10) provides that services need not be offered to a parent who failed to reunify with a sibling or half sibling of the dependent child.

social worker sent an ICWA-030 notice to the three recognized Cherokee tribes and the Bureau of Indian Affairs (BIA).

Soon after the detention hearing, mother was assessed for alcohol and drug treatment services (AOD) and referred to a program for treatment. In April of 2017, she transferred her services to another residential treatment program in hopes of having C.S.2 and C.S.3 placed with her there.

No services were recommended for father, but he self-enrolled for AOD assessment and treatment. He reported that he would stay in the program even if services were denied him, as he needed to "break the cycle of drug abuse" in his family.

At the scheduled jurisdiction/disposition hearing April 25, 2017, father was present and paternity testing ordered. At the hearing, father was questioned about his Native American heritage and, in response to the answers he provided, a second ICWA-030 notice was sent the following day.

The agency was given discretion to place C.S.2 and C.S.3 with mother at her treatment facility. The matter was continued to June 13, 2017.

On May 4, 2017, the Eastern Band of Cherokee Indians sent letters indicating neither C.S.2 nor C.S.3 were registered or eligible to register and neither were considered to be a Native American Indian Child for purposes of ICWA.

Prior to the June 13, 2017, hearing, the agency filed an addendum report, recommending continuing services for mother and denying services for father. Mother was in compliance with all recommended services and remained in her residential treatment program.

At the June 13, 2017, hearing, the juvenile court found father to be the presumed father of C.S.2 and C.S.3 when it was revealed that mother's husband was incarcerated at the time of their conceptions. Both mother and father submitted on the record and the juvenile court found the petition true.

The juvenile court removed C.S.2 and C.S.3 from parental custody and granted the agency discretion to place the two with mother at her treatment facility when appropriate. Mother was admonished that, if the two were placed with her, she was not to leave the program. A six-month review was scheduled for November 28, 2017.

ICWA determination was set for July 20 and eventually held August 1, 2017. In anticipation of the hearing, the agency filed an addendum report indicating that the Eastern Band of Cherokee Indians had responded that the children were not eligible. No response was received from the Cherokee Nation or the United Keetoowah Band of Cherokee.

At the hearing, the juvenile court granted the agency's request to find that the ICWA did not apply. While mother and father were not present at the hearing, counsel for both were.

*Six-Month Review*

The report prepared for the six-month review recommended that mother continue to receive family maintenance services. The agency had placed C.S.2 and C.S.3 with mother at her treatment facility in June of 2017 and, after completing the program, mother moved into independent housing with the two in September of 2017. Mother was participating in an aftercare program. She had five negative drug tests, but two "[n]o show[s]." Mother had an outstanding warrant for failure to appear on her criminal case for a substance abuse conviction from May of 2017.

In November 2017 it was decided that mother and C.S.2 were to have weekly therapy sessions together due to C.S.2's behavior. C.S.2 would also have weekly individual therapy sessions.

According to mother, she was not in a romantic relationship with anyone and she was looking for work.

Father had supervised visits twice weekly and had missed two of the scheduled 23 visits.

On November 28, 2017, the juvenile court adopted the recommendations of the agency and set a 90-day review for February 27, 2018 to evaluate possible termination of jurisdiction.

On January 23, 2018, the agency was advised by mother's substance abuse program that she tested positive for alcohol on December 28, 2017. Mother admitted drinking beer during a family gathering, but that C.S.2 and C.S.3 were with maternal grandmother at the time. She denied any drug use. Mother reported that father had been harassing her, thinking she was in a relationship with another man, which she claimed not to be.

In early February 2018, the agency discovered that mother had tested positive for methamphetamine in late January. Mother admitted drug use on three occasions in January, but claimed C.S.2 and C.S.3 were with maternal grandmother at the time. Mother blamed her drug use on father, whom she said she let into her house three times when he continued to harass her, although C.S.2 and C.S.3 were only home one of the times she let him in.

*387 Petition*

On February 5, 2018, the agency filed a section 387 petition to remove C.S.2 and C.S.3 from mother's custody. The agency reported that, since the six-month review hearing in November 2017, mother had missed numerous random drug tests in the two-month period, claiming she was either busy with the children, forgot to call, did not have a telephone, or lacked transportation. The agency was unable to locate father.

On February 6, 2018, C.S.2 and C.S.3 were detained and a contested jurisdiction hearing set for March 6, 2018. The previously scheduled 90-day review hearing scheduled for February 27, 2018, was vacated.

7.

*Jurisdiction/Disposition*

The report prepared for jurisdiction/disposition recommended mother be offered reunification services and that the agency have discretion to return C.S.2 and C.S.3 to mother when she made satisfactory progress in her case plan.

Mother reported that she was attending domestic violence counseling, had completed her parenting classes, and successfully completed mental health services. She was discharged from her aftercare program and referred for outpatient drug treatment. In February 2018, mother tested positive for methamphetamine on February 6, and failed to show for tests on February 2, 5, 7, 15, and 16.

When asked, mother again said she had no Native American heritage. When father was located and asked on February 5, 2018, father stated he did not have Native American heritage.

At the March 6, 2018, hearing, mother submitted on the section 387 petition; father was not present. The juvenile court found the petition true. A 12-month review hearing was set for May 10, 2018.

*12-Month Review*

The report prepared for the 12-month review recommended services be terminated and a section 366.26 hearing set. Mother was not complying with services and was terminated from her drug treatment program for missed appointments and failing to drug test. Mother had not been attending domestic violence counseling, stating she was too busy as she was helping renovate a friend's house. She again insisted she was not in a romantic relationship.

C.S.2 was not able to attend therapy sessions because mother held decision making rights and had not signed the consent documents. C.S.2 and C.S.3 remained in a foster home. While maternal grandmother had begun the Resource Family Approval process, she had not submitted the necessary paperwork.

Mother again let father into her home, despite a restraining order. She said she felt sorry for him, as he had not eaten or showered for some time.

Mother's visits were to be three supervised two-hour visits per week. She asked that the visits be changed to twice a week for three hours each. This accommodation was made, but mother then requested to end the visits one-half to one hour early, claiming C.S.2 and C.S.3 were hot when visits occurred outside, or that it was time for the children to nap if the visit was inside. Mother missed two of the 18 scheduled visits.

Father's visits were to be two supervised visits per week, but he failed to visit between February 6, 2018 and late March 2018. He missed 15 of 18 scheduled visits.

On May 10, 2018, mother requested a contested review hearing, which was then set for May 31, 2018. At the contested hearing, mother's counsel stated that mother was back in services and offered to do a hair follicle test. Father's counsel stated that father was doing services on his own and was in an aftercare program. A hair follicle test was ordered for mother and the case continued to June 21, 2018.

In an addendum report filed June 20, 2018, the agency reported that it was notified mother had given birth to another child, S.S. Mother had received no prenatal care and claimed she did not know she was pregnant until a month before the child's birth. She did not seek care at that point because she claimed to be "focus[ed] on her case plan services." S.S. was born prematurely at approximately 37 weeks. Both mother and S.S. tested negative at the time of delivery.

According to mother, she re-entered substance abuse treatment on May 2, 2018 and tested negative on May 30, 2018. Father provided information he had completed inpatient drug treatment and tested negative on April 22 and June 3, 2018.

Mother's hair follicle test came back positive for methamphetamine, although mother denied using drugs after mid-February 2018. The report indicated that mother did not attend any random drug tests on February 2, 5, and February 7 through June 6, 2018, missing all 21 ordered tests. Mother completed her domestic violence program.

9.

A team decision meeting was held, and it was decided to recommend allowing S.S. to go home with mother with court-ordered family maintenance services. The agency changed its original recommendation of termination of mother's services for C.S.2 and C.S.3 to offering continued family reunification services and setting a 90-day hearing to determine compliance.

The agency filed a non-detained section 300 petition regarding S.S. on June 14, 2018.

At the June 21, 2018, combined 12-month review for C.S.2 and C.S.3 and section 300 plea hearing for S.S., mother stated she was allowing father to care for S.S. in her home while she attended NA/AA meetings.

The juvenile court ordered that father could have unsupervised visits with S.S., and when he enrolled in domestic violence classes, the agency would have discretion to allow him to return to mother's home. Reunification services for C.S.2 and C.S.3, who remained in foster care, were continued.

Jurisdiction/disposition for S.S. and an interim review for C.S.2 and C.S.3 was scheduled for August 2, 2018.

_Jurisdiction/Disposition and Interim Review_

The agency report prepared for the hearing recommended that mother continue to receive reunification services for C.S.2 and C.S.3 with discretion to return them to mother's care. It recommended family maintenance services for S.S. The report noted that father had not filed a section 388 petition to receive services for C.S.2 and C.S.3.

When asked after the birth of S.S. if he had Indian ancestry, father again said he did not.

The report stated that mother had said on June 20, 2018, that she last used methamphetamine in February of 2018. But later, at the same meeting, stated she did not realize she was pregnant with S.S. until April of 2018 and that was what prompted her to

10.

quit using methamphetamine. Mother said she had a "co-parenting relationship" with father but denied that he lived in her home.

Due to mother's failure to sign paperwork, C.S.2 had not yet resumed therapy, but had an appointment for August 7, 2018, to begin again.

S.S. appeared to show signs of in utero substance absorption, with tremors in her arms and mouth, stiffness in her arms and legs, and poor head control. Mother was shown how to address S.S.'s symptoms.

Prior to the August 2, 2018, hearing, father filed a section 388 petition seeking reunification services for S.S. At the hearing, the juvenile court granted father's counsel's request to amend the petition to state that he desired services for C.S.2 and C.S.3. The juvenile court then ordered father to receive reunification services for C.S.2 and C.S.3 and family maintenance for S.S. An 18-month review was set for September 18, 2018.

### 18-Month Review

The report prepared for the 18-month review recommended that C.S.2 and C.S.3 be returned to the custody of both mother and father with family maintenance services. The report noted that, because of mother's failure to follow through, C.S.2's therapy had still not resumed, and a new referral made. As of August 24, 2018, mother was in compliance with her outpatient drug treatment program and would be starting aftercare on September 10, 2018.

Father had signed up for, but not started domestic violence classes. He had not yet begun coparenting classes. Visits with both parents had occurred regularly and no problems were noted with them.

The report listed all the times the parents had been questioned about Native American ancestry and that there were no new claims of such.

11.

The social worker evaluating the situation stated that, because S.S. was adequately cared for by mother and father, "the agency cannot find that it would be detrimental" to return C.S.2 and C.S.3 with court supervision.

With reservations that the household would now have three young children, the juvenile court followed the recommendations of the agency. A status review was set for January 22, 2019.

*Status Review*

The report prepared for the status review recommended that family maintenance services continue for all three children with both mother and father. Mother stated father was not living in the home but that they were in a romantic relationship. Both parents were participating in services and testing negative. There were no new claims of Native American ancestry.

C.S.2 was now in counseling and diagnosed with persistent adjustment disorder with mixed disturbance of emotions and conduct. C.S.2's behavior was said to be caused by her exposure to her parents' substance use, domestic violence and the stressor of being in foster care.

The juvenile court ordered six more months of family maintenance services. A review hearing was set for July 2, 2019.

*Second Section 387 Petition*

On June 24, 2019, the agency filed a second section 387 petition to remove all three children from custody, this time alleging mother had relapsed and continued to abuse substances. Mother had voluntarily left the home on June 20, 2019, leaving the children with father. The report attached to the petition requested that C.S.2, C.S.3 and S.S. be removed from mother's custody and remain in father's care.

Mother admitted relapsing and she tested positive for methamphetamine in June of 2019. She had stopped random testing shortly after the January review hearing, stating

12.

she was busy with the children and maternal grandmother. Father completed his treatment program and his parenting classes.

At the June 25, 2019, detention hearing, it was noted that neither parent claimed Native American ancestry. The juvenile court followed the recommendations of the agency and a jurisdiction hearing was set for July 23, 2019.

*Jurisdiction/Disposition*

The report prepared for the hearing indicated that on June 14, 2019, mother admitted relapsing on May 13, 2019. She insisted that father did not know of her relapse and she would continue in her substance abuse program. However, the social worker learned that mother tested positive in her program and was discharged.

Mother re-entered the program, with an expected completion date of April 2020. Mother had failed to test since the previous hearing and stated she began using again due to the stress of caring for the children and maternal grandmother, who was sickly. Mother was now living with maternal grandmother, who cared for the children while father was at work. Mother reportedly helped maternal grandmother with the children under maternal grandmother's supervision.

The report indicated that there were no new claims of Native American Indian Ancestry.

It was recommended that services for mother be terminated as to C.S.2 and C.S.3 as mother had now received 29 months of services and she was not entitled to further services. It was further recommended that mother receive reunification services for S.S., as she had not previously received them for her.

At the July 23, 2019 hearing, mother and father submitted on the report and recommendation. The juvenile court found the section 387 petition true and followed the recommendations of the agency. The juvenile court granted the agency discretion to place S.S. with mother if she entered a drug treatment program. A review hearing was set for January 14, 2020.

*Third Section 387 Petition*

A third section 387 petition to remove all three children was filed in August of 2019. The report prepared for the hearing stated that, on August 1, 2019, mother was arrested for possession of methamphetamine for sale. The home where father was living with the children had been under surveillance and it appeared that mother was actively selling drugs from the home. A methamphetamine pipe and a scale with methamphetamine residue were found in the home. Mother insisted father was unaware of her drug activities. Father was not arrested.

At the time of her arrest, mother told a social worker that she was at the home to have a visit, even though her visits were supposed to be supervised by maternal grandmother. Mother reported that father had been aggressive toward her and she thought of leaving with the children, although she acknowledged that she was under the influence when she arrived at the house. Mother reported that the children witnessed father yelling at her, and C.S.2 had gotten "involved," telling father not to yell at mother. Mother acknowledged daily methamphetamine use in the past month.

The children, who had been placed into protective custody, were detained by the juvenile court on August 6, 2019. A jurisdiction/disposition hearing was set for September 10, 2019.

*Jurisdiction/Disposition*

The agency report prepared for the hearing recommended the children remain in foster care, that reunification services be denied both mother and father, and a section 366.26 hearing set.

The report provided further details of the day mother was arrested. At the time, father stated mother did not live there and he did not know if she was using, although she appeared to be. Father also claimed he had been allowed to supervise visits with mother and that they had an argument, during which he left to defuse the situation. When he

14.

returned, the police had arrived and arrested mother. In mid-August 2019, mother entered another inpatient drug treatment program.

Father reported he had also relapsed and entered an inpatient program on August 8, 2019 and completed the inpatient phase on September 3, 2019. He had been discharged from the domestic violence program for noncompliance.

C.S.2 continued to attend therapy and was having severe behavioral problems in foster care, including choking C.S.3 and pushing C.S.3's head under water. She had to be watched constantly while around other children.

At the detention hearing, mother and father had been ordered visits twice per week. Mother missed three of six visits; father missed four of six visits.

A CASA report further described C.S.2's aggressive behavior, including hitting herself in the head, destroying things on purpose and hurting other children without remorse. C.S.3 was also observed to have extended temper tantrums and hitting her own head.

A contested jurisdiction/disposition hearing was set for October 15, 2019.

*Section 388 Petition*

On September 26, 2019, the agency filed a section 388 petition seeking to terminate reunification services early for both mother and father as to S.S.

*Addendum Report*

An addendum report for the jurisdiction/disposition hearing indicated that the children had been placed with maternal grandmother on October 4, 2019, and she was willing to provide permanency through guardianship or adoption for the children. Mother remained in treatment. Father got a new job in Kern County and was not participating in the domestic violence program and had missed random drug tests.

The agency recommended sustaining the section 387 petition, denying further services, and setting a section 366.26 hearing with a plan of adoption.

At the October 15, 2019 hearing, father did not appear, and mother submitted on the report. The juvenile court found the petition true, denied further services and set a section 366.26 hearing for February 4, 2020.

*Section 366.26 Report*

The CASA report stated that mother and father were visiting at maternal grandmother's home twice weekly, but that C.S.2's behavior issues after the visits increased C.S.2's unwillingness to listen to maternal grandmother. It took C.S.2 a few days after each visit to readjust. When asked who her favorite person was, C.S.2 stated the CASA and maternal grandmother.

The section 366.26 report recommended termination of parental rights and adoption by maternal grandmother. Maternal grandmother reported that father's interaction with the children was appropriate, but only when he was in a rehab facility, otherwise he was inconsistent and did not interact with the children. Maternal grandmother reported that mother is consistent in her visits, but at times must be asked to leave because she yells at the children or has no interaction with them.

The report indicated there had been no new claims of Native American Indian Ancestry.

A contested hearing was set for February 28, 2020.

*Section 388 Petition*

On February 21, 2020, mother filed a section 388 petition requesting additional services, alleging she had completed her inpatient drug treatment and was now in aftercare.

On the same day, father filed a section 388 petition also seeking services, alleging he was again in residential treatment with a completion date of April 9, 2020.

Both petitions were set for hearing on February 28, 2020, to coincide with the section 366.26 hearing.

16.

Father was present at the February 28, 2020 hearing; mother had been at the courthouse but left before the hearing.

In addressing the section 388 petition, father testified that he had entered treatment on January 6, 2020, was visiting the children weekly on his Saturday pass, and he had been clean for 53 days.

The juvenile court denied both mother and father's section 388 petitions.

Father's counsel then argued the parent-child relationship exception applied and because the children were with maternal grandmother, father had more time to show his sobriety. Counsel argued that father's visits with the children were consistent and appropriate.

Mother's counsel argued that C.S.2 had only been out of the home for three months prior to this latest removal and was old enough to know who her parents were, and she had a relationship with them. Counsel requested that guardianship be ordered.

The juvenile court, in its ruling, stated that the facts addressing the section 388 petition and section 366.26 hearing "overlap[]" and were basically the same. The court noted that the children, particularly C.S.2, know who their parents are and obviously love them, but that the history of the case "overrides all the other issues." The juvenile court further noted that, because the children were with maternal grandmother, they would likely continue to have contact with mother and father, but the court clarified that its decision was not based on this factor. The juvenile court queried maternal grandmother, who was present, and she agreed adoption would be best for the children. Parental rights were terminated and adoption ordered.

## DISCUSSION

I.     BENEFICIAL PARENT-CHILD RELATIONSHIP EXCEPTION

Mother and father both contend the juvenile court erred in terminating their parental rights because there was substantial evidence both maintained regular visitation

17.

with the children and that the children would benefit from continuing the parent-child relationship. As we discuss, the argument is without merit.

At the permanency planning hearing, the juvenile court determines a permanent plan for the child, and may order one of three alternative plans: adoption, guardianship, or long-term foster care. (§ 366.26, subd. (b); see *In re J.C.* (2014) 226 Cal.App.4th 503, 528.) " '[T]here is strong preference for adoption over the alternative permanency plans.' [Citation.]" (*In re Anthony B.* (2015) 239 Cal.App.4th 389, 395.) Generally, if the court finds the child adoptable the court must terminate parental rights. "[T]o avoid termination of parental rights and adoption, a parent has the burden of proving, by a preponderance of the evidence, that one or more of the statutory exceptions to termination of parental rights set forth in section 366.26, ... apply." (*Ibid.*)

*Legal Principles Regarding the Parent Child Relationship Exception*

The parent child relationship exception to termination of parental rights exists where "[t]he court finds a compelling reason for determining that termination would be detrimental to the child" (§ 366.26, subd. (c)(1)(B)) because "[t]he parents have maintained regular visitation and contact with the child *and* the child would benefit from continuing the relationship." (§ 366.26, subd. (c)(1)(B)(i), italics added.)

In deciding whether the exception applies, " 'the court balances the strength and quality of the natural parent/child relationship in a tenuous placement against the security and the sense of belonging a new family would confer.' [Citation.] If severing the natural parent/child relationship would deprive the child of a substantial, positive emotional attachment such that the child would be greatly harmed, the preference for adoption is overcome and the natural parent's rights are not terminated.' " (*In re J.C., supra,* 226 Cal.App.4th at pp. 528–529, citing *In re Autumn H.* (1994) 27 Cal.App.4th 567, 575.)

The factors the juvenile court considers in making this case-by-case assessment include: " 'The age of the child, the portion of the child's life spent in the parent's

18.

custody, the "positive" or "negative" effect of interaction between the parent and child, and the child's particular needs ….' [Citation.]" (*In re G.B.* (2014) 227 Cal.App.4th 1147, 1166.) The benefit exception "does not permit a parent who has failed to reunify with an adoptable child to derail an adoption merely by showing the child would derive some benefit from continuing a relationship." (*In re Jasmine D.* (2000) 78 Cal.App.4th 1339, 1348.) "It is not enough to show that the parent and child have a friendly and loving relationship." (*In re J.C., supra,* 226 Cal.App.4th at p. 529.) " ' "[A] child needs at least one parent. Where a biological parent ... is incapable of functioning in that role, the child should be given every opportunity to bond with an individual who will assume the role of a parent." [Citation.]' [Citation.]" (*Ibid.*)

*Standard of Review*

Appellate courts are divided over the appropriate standard of review to apply to an order determining the applicability of the beneficial parent child relationship exception.[3] Some courts have applied the substantial evidence test (e.g., *In re G.B., supra,* 227 Cal.App.4th at p. 1166), while others have applied the abuse of discretion standard (e.g., *In re Jasmine D., supra,* 78 Cal.App.4th at p. 1351.) Still other courts have adopted a mixture of both standards, applying the " 'substantial evidence standard of review to the factual issue of the existence of a beneficial parental relationship, and the abuse of discretion standard to the determination of whether there is a compelling reason for finding that termination would be detrimental to the child.' " (*In re E.T.* (2018) 31 Cal.App.5th 68, 76.)

Our conclusion in this case would be the same under any of these standards because the practical differences between them are "not significant," as they all give deference to the juvenile court's judgment. (See *In re Jasmine D., supra,* 78 Cal.App.4th

---

[3] This issue is currently before the California Supreme Court in *In re Caden C.* (2019) 34 Cal.App.5th 87 (rev. granted July 24, 2019, S255839).

at p. 1351.) " '[E]valuating the factual basis for an exercise of discretion is similar to analyzing the sufficiency of the evidence for the ruling.... Broad deference must be shown to the trial judge. The reviewing court should interfere only " 'if [it] find[s] that under all the evidence, viewed most favorably in support of the trial court's action, no judge could reasonably have made the order that he [or she] did.' " ' " (*Ibid.*) Moreover, a substantial evidence challenge to the juvenile court's failure to find a beneficial parental relationship cannot succeed unless the undisputed facts establish the existence of those relationships, since such a challenge amounts to a contention that the "undisputed facts lead to only one conclusion." (*In re I.W.* (2009) 180 Cal.App.4th 1517, 1529, disapproved on other grounds in *Conservatorship of O.B.* (2020) 9 Cal.5th 989, 1010, fn. 7; *In re Bailey J.* (2010) 189 Cal.App.4th 1308, 1314.)

*Analysis*

Here, there was little discussion about the beneficial parent child exception at the section 366.26 hearing, by either the parties or the juvenile court. However, the juvenile court made it clear that the evidence presented for the section 388 petition was considered for the section 366.26 hearing.

On appeal, mother and father both contend that the first prong of the exception, that they visited regularly, was met. Respondent disagrees with father's assertion but agrees with mother's. However, even assuming, arguendo, that both mother and father met the first prong of the exception by maintaining regular visits with the children, neither met their burden on the second prong—that the parent seeking to establish the beneficial relationship exception to adoption must prove *not only* that it would benefit the child to continue the parental relationship, but also that continuing the relationship would "promote[ ] the well-being of the child to such a degree *as to outweigh* the well-being the child would gain in a permanent home with new, adoptive parents." (*In re Autumn H., supra,* 27 Cal.App.4th at p. 575, italics added.)

We conclude the juvenile court acted within its discretion in finding the beneficial parent-child relationship exception did not apply and terminating mother and father's parental rights. While mother and father and the children may have a loving relationship, and both identified ways they were appropriate and met the children's needs during supervised visits, outside of visits both mother and father's continued relapse into drug use and failure to follow through on services made them unreliable and neglectful. These children were removed at a young age: C.S.2 spent about two-thirds of her life as a dependent of the juvenile court, and C.S.3 and S.S. their entire lives.  Mother was provided over 29 months of services and was still dealing with the original issues that caused the juvenile court to claim dependency.  Father had originally been denied services because he had already lost custody of two other children.  His more recent attempts to comply with offered services was minimal.

The record also shows that the children were being cared for in a prospective adoptive home where their physical, developmental, emotional and daily needs were being met.  C.S.2 especially suffered from mother's instability during the court process which prevented her from receiving the mental health treatment she needed.  The court could reasonably conclude that the children's well-being would continue to improve when permanently adopted by a fully attentive parent.

Here, the juvenile court determined that neither mother nor father satisfied their burden of proof by a preponderance of the evidence. Based on the record before us, we cannot find—as a matter of law—that the evidence compels a contrary finding.  (See *In re I.W., supra,* 180 Cal.App.4th at p. 1528.)  Further, there is substantial evidence to support the court's ruling, as well as the overriding statutory preference in favor of the children's adoption.  (See *In re G.B., supra,* 227 Cal.App.4th at p. 1166 [" ' "it is only in an extraordinary case that preservation of the parent's rights will prevail over the Legislature's preference for adoptive placement" ' "].)

Thus, the juvenile court did not err in finding that the parent child benefit exception did not apply and ordering the termination of mother and father's parental rights was proper.

## II. ICWA NOTICE COMPLIANCE

Father, with mother joining, also contends the juvenile court erred in finding that the ICWA did not apply, claiming the agency failed to adequately inquire about father's possible Native American ancestry, and failed to report known information to the appropriate tribes. We find no prejudicial error.

*Background*

When originally asked about Native American ancestry, father told the social worker his paternal grandparents used to tell him they were Cherokee but were not enrolled with a Cherokee tribe. Father completed an ICWA-020 form on April 10, 2017 indicating he may have Indian ancestry and identified Cherokee as the tribe. On that same date, the agency sent an ICWA-030 notice to the three recognized Cherokee tribes and the Bureau of Indian Affairs (BIA). The ICWA-030 form listed father's mother's name as "Helen Cathrine [Ar.]" and "Helen Cathrine [G.] (maiden)." Father's father was listed with his full name, but no information was provided about father's grandparents or great-grandparents, and no current or former addresses, or birth or death dates were included for anyone listed.

At the scheduled jurisdiction/disposition hearing April 25, 2017, father said he had Cherokee ancestry on both his mother and father's side of the family. He was then questioned about his Native American heritage and, in response to the answers he provided, a second ICWA-030 notice was sent the following day. On the second ICWA-030 notice, father's mother's name was listed as "Helen Cathrine [Ar.]" and incorrectly repeated as "Helen Cathrine [Ar.] (maiden)." In addition, father's grandmothers were listed, one as Helen Ar. and the other as Grandma G., and father's grandfather was listed as "Rudolph."

On May 4, 2017, the Eastern Band of Cherokee Indians sent letters indicating that neither C.S.2 nor C.S.3 were registered or eligible to register and were not considered to be a Native American Indian Child for purposes of ICWA.

ICWA determination was set for July 20 and eventually held August 1, 2017. In anticipation of the hearing, the agency filed an addendum report indicating that the Eastern Band of Cherokee Indians had responded that the children were not eligible. No response was received from the Cherokee Nation or the United Keetoowah Band of Cherokee.

At the hearing, the juvenile court granted the agency's request to find that the ICWA did not apply. While mother and father were not present at the hearing, counsel for both were.

*The ICWA*

ICWA was enacted " 'to protect the best interests of Indian children and to promote the stability and security of Indian tribes and families by the establishment of minimum federal standards for the removal of Indian children from their families and the placement of such children in foster or adoptive homes which will reflect the unique values of Indian culture ....' [Citation.]" (*In re Isaiah W.* (2016) 1 Cal.5th 1, 8; see 25 U.S.C. § 1902.) Under ICWA, an "Indian child" is "any unmarried person who is under age eighteen and is either (a) a member of an Indian tribe or (b) is eligible for membership in an Indian tribe and is the biological child of a member of an Indian tribe." (25 U.S.C. § 1903(4); see also Welf. & Inst. Code, § 224.1, subd. (a) [adopting federal definition of "Indian child"].)

Providing notice to Indian tribes of a child's dependency proceedings is essential to satisfying ICWA's purpose. (*In re Isaiah W., supra,* 1 Cal.5th at pp. 7–9.) Proper notice enables a tribe to determine whether the child is an Indian child and, if so, whether to intervene in, or exercise jurisdiction over, the child's dependency proceeding. (*Id.* at pp. 8–9.)

This case spanned a period of three years and involved multiple removals from parental care. Between the time of the first removal in 2017 and the final removal in 2019, the law at both the federal and state levels regarding the ICWA notice requirements changed.

In 2006, the California Legislature enacted provisions affirming the ICWA's purpose (§ 224, subd. (a)) and mandating compliance with ICWA in all Indian child custody proceedings (§ 224, subd. (b)). (See *In re Isaiah W., supra,* 1 Cal.5th at p. 9.) Historically, ICWA notice requirements have been triggered by a court's "reason to know" a child may be an Indian child for ICWA purposes. (25 U.S.C. § 1912(a).) While the federal law did not initially define "reason to know," it was defined by the California Legislature to include information provided by "a person having an interest in the child … suggesting the child is a member of a tribe or eligible for membership in a tribe," or if "one or more of the child's biological parents, grandparents, or great-grandparents are or were a member of a tribe." (Former § 224.3, subd. (b)(1); Stats. 2006, ch. 838, § 32.) In other words, little more than a "minimal showing" was required to trigger the statutory notice provisions. (See *Dwayne P. v. Superior Court* (2002) 103 Cal.App.4th 247, 258.)

Effective December 12, 2016, federal regulations were amended to provide minimum federal standards to ensure compliance with ICWA. (25 C.F.R. § 23.101, et seq.) The amended regulations required that, at the commencement of a dependency proceeding, the juvenile court ask each participant when he or she "knows or has reason to know" that the child is an Indian child, and must instruct the parties "to inform the court if they subsequently receive information that provides reason to know the child is an Indian child." (*In re M.W.* (2020) 49 Cal.App.5th 1034, 1042, citing 25 C.F.R. § 23.107(a).)

In the new federal regulations, the term "reason to know" was defined to include any of the following:

"(1) Any participant in the proceeding, officer of the court involved in the proceeding, Indian Tribe, Indian organization, or agency informs the court that the child is an Indian child;

"(2) Any participant in the proceeding, officer of the court involved in the proceeding, Indian Tribe, Indian organization, or agency informs the court that it has discovered information indicating that the child is an Indian child;

"(3) The child who is the subject of the proceeding gives the court reason to know he or she is an Indian child;

"(4) The court is informed that the domicile or residence of the child, the child's parent, or the child's Indian custodian is on a reservation or in an Alaska Native village;

"(5) The court is informed that the child is or has been a ward of a Tribal court; or

"(6) The court is informed that either parent or the child possesses an identification card indicating membership in an Indian Tribe."  (25 C.F.R. § 23107(c).)

This federal regulation was in effect at the time C.S.2 and C.S.3 were detained in March of 2017.  Father said he was told he had Cherokee ancestry by his grandparents, but they were not enrolled members of the tribe.  Thus, under federal law at the time, it is debatable whether there was a "reason to know" that the children were Indian children under ICWA, and thus no notice requirement under the federal regulations at the time.

But, as respondent concedes, the California law did not change to address the new federal regulations until January of 2019.  As such, under the earlier definitions of the California law as opposed to federal law at the time, notice was required as to C.S.2 and C.S.3, and we will address further whether proper inquiry and notice was done.  However, as for S.S., who was born in 2018, when father was asked about any possible Indian ancestry, he repeatedly reported that he had none.  We therefore need not address further whether proper inquiry or notice was done as to her.

*Inquiry and Notice*

The ICWA duty to inquire further about a child's Native American ancestry arises when "a person having an interest in the child ... informs or otherwise provides information suggesting that the child is an Indian child to the court[ or] the county welfare agency...." (Cal. Rules of Court, former rule 5.481(a)(5)(A).) In *In re Alice M.* (2008) 161 Cal.App.4th 1189, the court observed that further inquiry is necessary even when "vague or ambiguous information is provided regarding Indian heritage or association (e.g., 'I think my grandfather has some Indian blood.'; 'My great-grandmother was born on an Indian reservation in New Mexico')." (*Id.* at p. 1200.)

At the time C.S.2 and C.S.3 were first detained, ICWA notice was required to include " '[a]ll names known, and current and former addresses of the Indian child's biological mother, biological father, maternal and paternal grandparents and great grandparents or Indian custodians, including maiden, married and former names or aliases; birthdates; places of birth and death; tribal enrollment numbers, and/or *other identifying information*.' [Citation.]" (*In re C.B.* (2010) 190 Cal.App.4th 102, 140, citing C.F.R. § 23.11, subds. (a), (d)(3) (2010).)

We review the trial court's findings for regarding adequacy of inquiry and notice for substantial evidence. (*In re J.T.* (2007) 154 Cal.App.4th 986, 991.)

Father makes several specific contentions as to why the ICWA inquiry and notice was inadequate. He first contends that the juvenile court and the agency did not adequately question him for further information on his mother, so that she could be questioned regarding possible applicable family data.

When first questioned, father said he thought he had Cherokee heritage from both "mom and father." But when questioned further about his mother, father gave his grandmother's name, Helen Al., and stated she had raised him, and he considered her to be his mother. He said she was deceased. Told that he needed to provide his biological mother's name, not grandmother's, father stated that it was "Helen Catherine [Ar.] [G.],

from what I remember." Father stated that Ar. was the last person his mother had married and when father "was a kid," her name was G. He stated his mother was still alive, but "she's hard to get ahold of."

After further questioning about a specific relative, for which father had no information, the juvenile court asked if there was "any family that's living that might have more information." Father replied, "Not that I'm aware of. I haven't been in contact with any of my family since I was a little kid." When asked about the "other side" of his family, presumably his father's side, he stated that he referred to his grandmother as "Grandma [G.]" but that she was also deceased.

Father now contends he should have been asked for his mother's contact information, citing to *In re N.G.* (2018) 27 Cal.App.5th 474, 482, in which the court found that the agency failed to adequately interview extended family members when the parent had stated that paternal cousins were members of a tribe. Here, however, father was asked about extended members who were alive and might provide information, and he stated there were none, and he had not had contact with family since he was a small child. There was nobody for the agency to interview and no error occurred in inquiry.

We also reject father's claim that the agency did not provide enough information about its inquiry for the juvenile court to make a determination as to whether inquiry was sufficient. The inquiry referenced above all occurred in open court and the juvenile court was itself involved in the questioning. As such, the juvenile court was well aware of the extent of the inquiry when it made its determination that the ICWA did not apply.

Father also contends the ICWA notice itself was inadequate because it did not contain information known to the agency, specifically that his mother's maiden name, G., was not listed. Respondent concedes that father's mother's maiden name is incorrectly listed on the second ICWA-030 that was sent on April 26, 2017, with both her maiden and married last names being listed as Ar. However, the first ICWA-030 notice that was sent on April 10, 2017, lists father's mother's maiden name as G. and her married name

27.

as Ar., as provided by father in open court. Thus, while the second ICWA-030 notice included this error, the tribes had proper notice of father's mother's maiden and married names.

Father also contends the agency "knew" the last names of the father's grandparents and did not include them on the form. However, when asked in court, father stated that his grandmother's name was Helen Al. When asked if that was her maiden or married name, he stated she "didn't have another name." He said he only knew his grandfather by the name of "Rudolph."

Father contends the agency should have "deduced" that his grandfather and grandmother's last names were the same as father's own last name, as they were his paternal grandparents. However, father provided no clarification as to whether the name he gave for paternal grandmother was a maiden or married name but did state it was the only name she had. As for paternal grandfather, "Rudolph," there is no indication whether paternal grandmother and paternal grandfather ever married, or married more than once, or whether Rudolph was even father's biological grandfather. There was simply too little information for the agency to make this deduction.

Here, the agency did not omit known information, other than the inadvertent omission of father's mother's maiden name on the second notice, but which was on the first notice. It included all other information provided by father.

The agency provided all known information to the three Cherokee tribes by certified mail. The Eastern Band of Cherokee replied on May 4, 2017, that the children were not Indian children as related to their tribe.

ICWA determination was set for August 1, 2017, at which time the agency filed an addendum report indicating the Eastern Band of Cherokee's determination. No responses were received from the Cherokee Nation or the United Keetoowah Band of Cherokee.

At the time of the determination, section 224.3 provided, in pertinent part, that if proper and adequate notice have been provided and no determinative response is received

28.

within 60 days after receiving notice, the juvenile court may determine that the ICWA does not apply, "provided that the court shall reverse its determination of the inapplicability of the Indian Child Welfare Act and apply the act prospectively if a tribe or the Bureau of Indian Affairs subsequently confirms that the child is an Indian child." (former § 224.3, subd. (e)(3).)  No further response was received from any of the noticed tribes or the BIA.  Nor did father provide any further information and, in fact, on multiple later occasions during the dependency proceeding denied any Native American ancestry when asked.

We find no prejudicial error on inquiry and notice under the ICWA.

## DISPOSITION

The orders of the juvenile court are affirmed.